**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | | |
|---|---|---|
| **Jason Robles,** | ) | |
| *Petitioner,* | ) | |
| | ) | |
| **v.** | ) | **No. 1:22-cv-00720 (PTG/IDD)** |
| | ) | |
| **Warden, Wallens Ridge State Prison,** | ) | |
| *Respondent.* | ) | |

**MEMORANDUM OPINION**

Jason Robles ("Petitioner"), a Virginia inmate proceeding *pro se*, filed his Amended Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging the validity of his February 15, 2018 convictions in the Circuit Court for the City of Newport News, Virginia for thirteen felonies: one count of second-degree murder, four counts of abduction, one count of malicious wounding, six counts of use of a firearm in the commission of a felony, and one count of malicious discharge of a firearm in an occupied building. Dkt. 4 at 1; Dkt. 19-1 at 3–4.[1] The Respondent filed a Rule 5 Answer (Dkt. 16) and a Motion to Dismiss (Dkt. 17) with supporting briefs and exhibits (Dkts. 18–19). Petitioner exercised his right to respond to the Motion to Dismiss pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), and Local Rule 7(K). Dkt. 24.[2] Accordingly, this matter is now ripe for disposition. For the following reasons,

---

[1] *Commonwealth v. Robles*, Case Nos. CR15001158-00 to CR15001162-00, CR15001164-00, CR15001166-00, CR15001168-00 to CR15001173-00.

[2] On October 18, 2022, Petitioner filed a Motion to Dismiss Respondent's Request for Enlargement of Time (Dkt. 14), which is now moot. On November 1, 2022, Respondent filed a Motion for Second Enlargement of Time (Dkt. 15), which sought an extension through November 16, 2022 to respond to Petitioner's habeas petition. On November 15, 2022, Respondent filed his response to the habeas petition. Dkts. 16–19. On the same day, Petitioner filed a Motion for Denial of Enlargement Time (Dkt. 21), objecting to Respondent's Motion for Second Enlargement of Time (Dkt. 15) and moving for judgment. Respondent's response is

Respondent's Motion to Dismiss (Dkt. 17) will be granted, and the Amended Petition (Dkt. 4) will be dismissed with prejudice.

## I. Procedural History

Petitioner is detained pursuant to an order of the Circuit Court for the City of Newport News entered on March 14, 2018. Dkt. 19-1 at 6. On February 13, 2018, a jury convicted Petitioner of one count of second-degree murder in violation of Virginia Code § 18.2-32; four counts of abduction in violation of Virginia Code § 18.2-47; one count of malicious wounding in violation of Virginia Code § 18.2-51; six counts of use of a firearm in the commission of a felony in violation of Virginia Code § 18.2-53.1; and one count of malicious discharge of a firearm in an occupied building in violation of Virginia Code § 18.2-279. *Id.* at 1–3. In accordance with the jury's verdict, the court sentenced Petitioner to an aggregate sentence of 138 years of imprisonment. *Id.* at 4–6.

Petitioner appealed to the Court of Appeals of Virginia, asserting that: (1) the trial court violated his statutory right to a speedy trial where it "incorrectly interpreted" Virginia Code § 19.2-243; (2) the trial court violated his statutory right to a speedy trial where its "order granting a continuance of the January 23, 2018 trial date did not reflect that the [c]ourt tolled the speedy trial statute"; and (3) "the trial court erred 'in overruling his motion to strike all indictments'" because the evidence was insufficient to "establish that [Petitioner] aided and abetted the murder of the victim." Dkt. 19-2 at 2–6 (alteration in original). On February 21, 2019, a judge of the Court of Appeals of Virginia denied his petition for appeal, *id.* at 2, and on May 17, 2019, a three-judge panel adopted the judge's reasoning in the February 21, 2019 order, *id.* at 1.

---

deemed timely filed, which renders moot Respondent's Motion for Second Enlargement of Time (Dkt. 15) and Petitioner's Motion for Denial of Enlargement of Time (Dkt. 21).

Petitioner filed a petition for appeal in the Supreme Court of Virginia raising the same three

assertions of error. Dkt. 19-3 at 23, 35–36. On September 24, 2019, the Supreme Court of Virginia

refused the petition for appeal. *Id.* at 1.

On September 23, 2020, Petitioner filed an amended petition for a writ of habeas corpus in

the Supreme Court of Virginia. Dkt. 19-4 at 53. On December 20, 2021, the Supreme Court of

Virginia dismissed the state habeas petition. Dkt. 19-5 at 1.

## II. Background

The Court of Appeals, in finding the evidence sufficient to sustain Petitioner's convictions,

summarized the evidence at trial as follows:

> [J.C.], the victim's son, was fourteen years old at the time of the incident. [J.C.]
> stated that, in the early morning hours of May 10, 2014, a man who identified
> himself as "J" knocked on the front door of his residence and asked for the victim
> and [J.C.]'s uncle. [J.C.] had heard the victim refer to "J," and [J.C.] later identified
> appellant from a photograph lineup and in court as "J." Appellant held a black gun
> to his side, and he was with two other men. [J.C.] saw one of the other two men
> carrying a gun. [J.C.] told appellant that the victim could be at Williams' residence,
> which was located nearby. A couple of minutes after the three men left, [J.C.] heard
> multiple "really close gunshots."
>
> Adrian Pollard was living with [Asia] Williams and their five children on May 10,
> 2014. He stated that his friend, Robert Williams (Robert), and the victim were at
> their apartment at the time of the incident. Pollard testified that, at about 3:00 a.m.,
> he was in bed with Williams when he was awakened by a man pointing a gun at
> him and telling him to "[g]et the fuck up." The victim and Robert were still
> downstairs at that time. Pollard got up, and the gunman ordered him to go
> downstairs where the gunman ordered Pollard to get on the floor. Robert was on
> the floor, and Williams later joined them on the floor. Pollard did not try to look at
> the perpetrators' faces.
>
> Pollard initially remembered only two perpetrators being present, but after being
> confronted with his statement to the police wherein he stated that three men were
> in the apartment, he testified that three perpetrators were involved in the incident.
> On direct examination, Pollard stated that he saw one man with a gun, but on cross-
> examination, he agreed that two of the men had guns. The perpetrators asked for
> identification and money. Pollard told them his identification was upstairs. Pollard
> stated that "they" went upstairs, then came back downstairs and kicked him in the
> face and pointed the gun at his head. The perpetrators then discussed burning the
> apartment, and they poured what they thought was liquor on Pollard, Robert, and
> Williams, but the liquor bottles contained water.

Pollard testified that one of the suspects kicked Williams in the face when she spoke, and Pollard heard one of the men say, "[W]e're going to take her with us." About ten seconds later, Pollard heard gunshots. Pollard stated that he and Robert could not see the front door, but Williams was in a position to see the front door of the apartment during the shooting, and she was looking toward the door, the area where the shooting took place. Pollard waited about ten seconds then saw the deceased victim by the front door. Pollard did not know appellant or identify him as one of the suspects.

Williams testified that she noticed a "shadow" outside of the apartment window about 3:05 a.m. or 3:08 a.m. on May 10, 2014. Williams went upstairs, and she heard a knock at the front door. The victim, who was downstairs, asked Williams if she wanted the victim to answer the door. A short time later, Williams heard her bedroom door open and someone say, "Get the fuck up." Williams then saw a man wearing a red hoodie pointing a gun at Pollard's head. The gunman in the red hoodie ordered Pollard downstairs, then came back upstairs, pointed the gun at Williams, and ordered her to go downstairs. The gunman pushed Williams down the steps, causing her to fall to the bottom step where she encountered another man with a gun. This gunman struck Williams on the side of her face with the gun.

Williams pulled herself up on the railing, and she saw appellant, the victim, Robert, Pollard, and the man wearing the red hoodie. Williams positively identified appellant in court as one of the perpetrators. She stated that appellant was holding the victim by the front of her shirt, and appellant pointed a gun at the victim's head. Williams testified that the man in the red hoodie was yelling at the victim, and the victim responded, "[T]hey don't have nothing to do with this." The victim looked at Williams and mouthed the words "I'm so sorry" to her. The victim called out the name "Ky" while looking at appellant. Williams did not know any of the suspects before the incident, but she later identified Joe Thomas as the man who wore the red hoodie during the incident.

The perpetrators ordered Williams to get on the floor, and Thomas argued with the victim. Williams testified that Thomas yelled at the victim, "[Y]ou didn't give a fuck whenever you came up there and did what you did, you didn't give a fuck about my seed," then Thomas "ordered [appellant] and [the] other guy to beat the shit out of" the victim. Williams testified that appellant "started hitting [the victim] in the face with a gun," then the "other guy" came up and "started punching" the victim. They held the victim up and repeatedly struck her. The victim fell behind a couch, and Williams could no longer see what the men were doing to her. Williams stated that Thomas then kicked her and Pollard in the face, someone struck Williams in the head with a gun, and one of the men pointed a gun at Pollard, while Thomas asked where the drugs and money were located. Williams said that she did not have drugs, and her wallet was upstairs. Thomas went upstairs and returned with Williams' wallet, cell phone, charger, and keys to her truck.

Williams testified that Thomas also poured what he believed was liquor on the couch and on Williams and "tried to set the house on fire." When Pollard told Thomas that there was no liquor in the bottles, Thomas struck Pollard in the head with his gun, told Pollard to "shut the fuck up," and threatened to kill Pollard.

4

Thomas then ordered appellant and the third man to "get [the victim] up." Williams stated that "[t]hey tried to make [the victim] wake up from behind the couch. She wasn't moving." The men then dragged the victim from behind the couch into an area near the front door of the apartment. Williams testified that Thomas asked where the victim's brother was, but, when no one knew his whereabouts, Thomas became more angry and said, "[F]uck it, kill them all." Williams stated that the three perpetrators stood in front of the door "and gunshots just started going off." Williams "want[ed] to say" that she saw Thomas firing first, but she also saw appellant shooting a gun toward the victim. Williams was closer to the door than Pollard or Robert. Williams described the victim's body as "jerking" as the men shot her for about fifteen to twenty seconds. Williams also stated that Thomas fired his gun at Williams, and she did not realize that she had been shot in the right arm until the perpetrators had left the apartment. After the perpetrators shot the victim, Thomas told Williams, Pollard, and Robert not to leave the apartment because the perpetrators would still be outside.

Williams admitted that she did not initially want to be involved in the investigation of the case, but after she realized that the victim was dead, she "didn't want to let that go." Williams then gave the police "full details" about the facial features of the perpetrators and "the way they talked." Williams stated that she had not seen appellant or Thomas before the incident, and, after the incident, she identified both appellant and Thomas from photograph spreads.

Sandra Cleary, a Senior Forensic Technician, recovered twelve 9mm cartridge cases and numerous bullets from the scene. The victim had been shot approximately eleven times and had thirteen pairs of wounds, meaning entrance and exit wounds. Two bullets went into the victim's head, and nine bullets went through her neck and chest.

A technician testified that the twelve cartridge casings and ten of the recovered bullets "identified as having been fired from the same firearm." During his investigation, Detective Gordon located a Facebook account in the name of "Jason Ki Robles." Gordon testified that he located a photograph of appellant from the Facebook page. Gordon developed a photo spread containing a photograph of appellant, and on May 12, 2014, Williams identified the man in this photograph as one of the perpetrators. In addition, on May 13, 2014, [J.C.] identified the photograph of appellant as "J," the man who came to the front door of his residence before the shooting. Gordon, who had firearm training, also testified that a revolver does not eject a casing when it is fired.

Detective Nunez went with other officers to a motel to arrest appellant. During the search of the motel room, Nunez found a suitcase with documents containing the victim's name. Appellant was arrested outside of the motel. During an interview with law enforcement, appellant stated that he had recently traveled to Brooklyn, New York with a friend named "Joe."

Dkt. 19-2 at 7–10.

### III. Federal Petition

On June 14, 2022,[3] Petitioner filed a habeas petition in this Court, in which he appears to allege the following grounds for relief:

(A)   "Petitioner[']s 6th Amendment [right] was violated when trial counsel failed to investigate and articulate Asia Williams['] first interview where it provided material impeaching evidence." Dkt. 1 at 33–37.

Counsel failed to investigate and review Ms. Williams' first interview and failed to reasonably cross-examine and impeach Ms. Williams during trial. *Id.* at 33–34.

Trial counsel failed to investigate the report that the victim's family had harassed Ms. Williams. Had trial counsel investigated, he would have discovered that Ms. Williams was coerced and that she had misidentified Petitioner. *Id.* at 35.[4]

(B)   Petitioner's Fifth, Sixth, and Fourteenth Amendment rights were violated when trial counsel failed to seek the disclosure of *Brady*[5] evidence and the Commonwealth failed to disclose Ms. Williams' and other witnesses' Facebook and phone records. *Id.* at 38.[6] Petitioner also alleges that the Commonwealth violated *Brady* when it did not disclose police reports and information showing that the victim's family had been contacting Ms. Williams. *Id.* at 38–40.[7]

---

[3] Petitioner executed his federal petition on June 14, 2022, Dkt. 1 at 59, which is the date it is deemed filed for purposes of Respondent's Motion to Dismiss, Dkt. 17. *See Houston v. Lack*, 487 U.S. 266, 276 (1988) (holding that a document is "filed at the time [the] petitioner deliver[s] it to the prison authorities for forwarding to the court clerk").

The claims are set forth in the same order as in the petition and the Court has used sequential letters to label each claim. The claims include the docket cite for each claim for ease of reference.

[4] Petitioner raised this claim, labeled claim (A), in state habeas proceedings as portions of state habeas claims (A)(a), (A)(a)(i), (A)(a)(ii), (A)(a)(iii), (A)(b), and (A)(c). Dkt. 19-5 at 1–6, 9–10.

[5] *Brady v. Maryland*, 373 U.S. 83 (1963).

[6] Petitioner raised the claim, labeled claim (B), in state habeas proceedings as portions of state habeas claims (A)(b), (A)(c), (B)(10), and (B)(10)(i). Dkt. 19-5 at 9, 21.

[7] Petitioner raised this claim, labeled claim (B), in state habeas proceedings as portions of state habeas claims (B)(10) and (B)(10)(i). *Id.* at 21.

6

(C), (E)   Petitioner's Fifth, Sixth, and Fourteenth Amendment rights were violated when "trial counsel failed to investigate, interview [his] client, and prepare a defense of mis-identification." *Id.* at 40–42.[8]

(D)        Petitioner's Sixth Amendment right was violated when trial counsel failed to investigate and interview potential witnesses "that may have swung the case in [P]etitioner[']s favor." *Id.* at 42–44.[9]

(F), (G)   "Petitioner's [r]ight to effective assistance was violated when trial counsel failed to consult with an expert to conduct a rudimentary investigation necessary to decide upon the nature of a defense to be presented, to determine before trial what evidence he should offer, [to] prepare in advance how to counter damaging testimony, [and to] effectively cross-examine and rebut" the Commonwealth's witnesses. *Id.* at 44–45.[10]

(H)        Petitioner's Fifth, Sixth, and Fourteenth Amendment rights were violated when trial counsel failed to "point[] to gaping holes in [the] [C]ommonwealth[']s theory[,]" which would have provided the jury with a reasonable doubt. *Id.* at 45–46.[11]

(I)        Petitioner's Sixth Amendment right was violated when trial counsel "fail[ed] to prepare and present a defense" and trial counsel misled Petitioner regarding the likelihood of acquittal. *Id.* at 46–47.[12]

(J), (K)   Petitioner's Sixth Amendment right and due process rights were violated when trial counsel failed to object to the Commonwealth's "mis-representations" about the evidence and "inflammatory remarks[.]" *Id.* at 47–52.[13]

---

[8] Petitioner raised these claims, labeled claims (C) and (E), in state habeas proceedings as portions of state habeas claims (A)(a)(i), (A)(a)(ii), (A)(a)(iii), (A)(a)(iv), (A)(b), and (A)(h). *Id.* at 1–8, 13.

[9] Petitioner raised this claim, labeled claim (D), in state habeas proceedings as portions of state habeas claims (A)(d) and (A)(d)(i). *Id.* at 10–11.

[10] Petitioner raised these claims, labeled claims (F) and (G), in state habeas proceedings as portions of state habeas claims (A)(e), (A)(f), and (A)(f)(i). *Id.* at 11–12.

[11] Petitioner raised this claim, labeled claim (H), in state habeas proceedings as portions of state habeas claim (A)(h). *Id.* at 13.

[12] Petitioner raised this claim, labeled claim (I), in state habeas proceedings as portions of state habeas claims (A)(i)(ii) and (A)(i)(iii). *Id.* at 14–16.

[13] Petitioner raised these claims, labeled claims (J) and (K), in state habeas proceedings as portions of state habeas claims (A)(j), (A)(k), (B)(1)(a), (B)(2), and (B)(3), and in Parts (B)(4), (B)(5), (B)(5)(i), (B)(6) through (B)(9), and (B)(11) through (B)(13). *Id.* at 16–17, 19–22.

(L)     Trial counsel failed to challenge the Commonwealth's misrepresentation of the evidence during closing argument and failed to investigate the jury note that stated, "finger prints on shell casings." *Id.* at 53.[14]

(M)     Petitioner's right to a speedy trial was violated by a "series of unwarr[a]nted continuances[.]" *Id.* at 54–57.[15]

### III. Statute of Limitations

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a petition for a writ of habeas corpus must be dismissed if filed later than one year after: (1) the judgment becomes final by the conclusion of direct review or the expiration of the time for seeking such review; (2) any state-created impediment to filing a petition is removed; (3) the U.S. Supreme Court recognizes the constitutional right asserted; or (4) the factual predicate of the claim could have been discovered with due diligence. 28 U.S.C. § 2244(d)(1)(A)–(D). In calculating the one-year period, courts must exclude the time during which properly filed state collateral proceedings pursued by a petitioner were pending. *Id.* § 2244(d)(2); *Pace v. DiGuglielmo*, 544 U.S. 408, 410, 414 (2005) (determining that the definition of "properly filed" state collateral proceedings, as required by § 2244(d)(2), is based on the applicable "state law"). The U.S. Supreme Court has emphasized that an untimely state petition is not properly filed. *Id.* at 413.

Petitioner's petition is untimely under § 2244(d)(1)(A), which provides that the one-year period of limitation runs from the "date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A) On September 24, 2019, the Supreme Court of Virginia refused Petitioner's petition for appeal in a summary order. Dkt. 19-3 at 1. As of that date, Petitioner had ninety days to file a petition for a writ of certiorari in the U.S. Supreme Court for a review of the Supreme Court of Virginia's

---

[14] Petitioner raised this claim, labeled claim (L), in state habeas proceedings as portions of state habeas claim (A)(l). *Id.* at 17–18.

[15] Petitioner raised this claim, labeled claim (L), on direct appeal in the Court of Appeals of Virginia and on appeal to the Supreme Court of Virginia. Dkt. 19-2 at 52–58; Dkt. 19-3 at 43–46.

order refusing his petition for appeal. *See* U.S. Sup. Ct. R. 13(1) (allowing ninety days from entry

of an order denying discretionary review by the state court of last resort to file a petition for a writ

of certiorari to the U.S. Supreme Court). Thus, the one-year limitation period under 28 U.S.C.

§ 2244(d)(1)(A) began on December 23, 2019, the conclusion of the ninety days after the Supreme

Court of Virginia's refusal of Petitioner's petition for appeal on September 24, 2019. *See Harris*

*v. Hutchinson*, 209 F.3d 325, 328 n.1 (4th Cir. 2000) ("[T]he AEDPA provides that the one-year

period does not commence until the latest of the date when judgment on direct review 'became

final' or 'the expiration of the time for seeking such review.'" (quoting 28 U.S.C.

§ 2244(d)(1)(A))). Absent any applicable tolling period, Petitioner had until December 23, 2020—

one year from December 23, 2019—to file his federal habeas petition.

*A. Statutory Tolling*

Under AEDPA, which governs Petitioner's petition, a state prisoner must file his petition

for a writ of habeas corpus within one year of the completion of the state court direct review

process. 28 U.S.C. § 2244(d)(1)(A). This one-year limitation period is subject to tolling while a

"properly filed application for State post-conviction or other collateral review . . . is pending[.]"

*Id.* § 2244(d)(2).

Petitioner alleges that he filed his state petition for a writ of habeas corpus in the Supreme

Court of Virginia on September 23, 2020. Dkt. 4 at 3.[16] Between December 23, 2019 and

---

[16] In its Motion to Dismiss, Respondent does not dispute that Petitioner filed his state habeas petition in the Supreme Court of Virginia on September 23, 2020. Dkt. 19 at 10. However, per Petitioner's brief moving for leave to file an amended petition for a writ of habeas corpus, which Respondent attached as an exhibit to its Motion to Dismiss, Petitioner stated that he filed his petition on September 17, 2020, pursuant to *Houston v. Lack*, 487 U.S. 266 (1988). Dkt. 19-4 at 53. Because the difference between the two dates is not dispositive of the issue at hand and because neither Petitioner nor Respondent contest the September 23, 2020 date in their briefing before this Court, the Court will use September 23, 2020 as the date on which Petitioner filed his state habeas petition.

September 23, 2020, 275 days of the federal one-year limitation period elapsed. Thus, Petitioner had ninety days remaining after the conclusion of state habeas proceedings to file a federal habeas petition. The state habeas proceedings concluded on December 20, 2021, when the Supreme Court of Virginia dismissed Petitioner's state habeas petition. Dkt. 19-5 at 1. On the following day, December 21, 2021, Petitioner had ninety days, until March 21, 2022, to file his federal habeas petition. Petitioner filed his habeas petition on June 14, 2022, more than two months after the one-year limitation period elapsed. Dkt. 1 at 59. Thus, Petitioner's petition was not timely filed.

### B. Equitable Tolling

To qualify for equitable tolling, a petitioner must demonstrate that (1) "he has been pursuing his rights diligently, and (2) . . . some extraordinary circumstance stood in his way" and prevented timely filing. *Pace*, 544 U.S. at 418 (citation omitted). A petitioner asserting equitable tolling "bears a strong burden to show specific facts" that demonstrate fulfillment of both elements of the test. *Yang v. Archuleta*, 525 F.3d 925, 928 (10th Cir. 2008) (quoting *Brown v. Barrow*, 512 F.3d 1304, 1307 (11th Cir. 2008)). Equitable tolling is available only in "rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result." *Green v. Johnson*, 515 F.3d 290, 304 (4th Cir. 2008) (quoting *Rouse v. Lee*, 339 F.3d 238, 246 (4th Cir. 2003) (en banc)). "[E]ven in the case of an unrepresented prisoner, ignorance of the law is not a basis for equitable tolling." *United States v. Sosa*, 364 F.3d 507, 512 (4th Cir. 2004) (citations omitted).

Petitioner's Amended Petition for a writ of habeas corpus states, "I have filed timely[,]" but does not specify the steps Petitioner took to timely file after the Supreme Court of Virginia's dismissal of his state habeas petition. Dkt. 4 at 13. In his Reply to the Respondent's Motion to Dismiss, with respect to the statute of limitations, Petitioner argues that "the federal courts allow

180 day[s] to file in its court after state exhaustion. [Petitioner] timely filed in 176 day[s] from De[cember] 20, 2021 to June 14, 2022." Dkt. 24 at 8. Petitioner does not provide a citation to any authority to support this argument. Thus, it appears that Petitioner misunderstood the law concerning the applicable statute of limitations. Under Fourth Circuit law, Petitioner's "misconception about the operation of the statute of limitations is neither extraordinary nor a circumstance external to his control." *Sosa*, 364 F.3d at 512.[17]

The record demonstrates that Petitioner completed state habeas proceedings with about three months remaining before the one-year federal statute of limitations expired and that there was no impediment that prevented him from timely filing. Because Petitioner has failed to demonstrate that he pursued his rights diligently and that some extraordinary circumstance prevented him from filing in a timely manner, he is not entitled to equitable tolling. *Green*, 515 F.3d at 304.

*C. Actual Innocence*

The U.S. Supreme Court has recognized actual innocence as a basis for overcoming the expiration of the statute of limitations. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) ("[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . or . . . expiration of the statute of limitations."). To establish

---

[17] Although Petitioner does not rely on *Martinez v. Ryan*, 566 U.S. 1 (2012), which recognized an exception for a substantial claim of ineffective assistance of counsel, any such reliance would be misplaced. The *Martinez* exception does not apply to Petitioner because *Martinez* "'has no application to the operation or tolling of the § 2244(d) statute of limitations' for filing a § 2254 petition." *Lambrix v. Sec'y, Fla. Dep't of Corr.*, 756 F.3d 1246, 1249 (11th Cir. 2014) (quoting *Chavez v. Sec'y, Fla. Dep't of Corr.*, 742 F.3d 940, 943 (11th Cir. 2014)); *Wilson v. Perry*, No. 1:14cv576, 2014 WL 4685405, at *1 (M.D.N.C. Sept. 19, 2014) ("*Martinez* . . . addressed whether a procedural bar, rather than a time bar, should apply to an ineffective assistance of counsel claim from a state habeas proceeding. Thus, *Martinez* . . . [is] inapplicable to the determination of untimeliness under the AEDPA one-year statute of limitations."), *appeal dismissed*, 588 F. App'x 216 (4th Cir. 2014).

actual innocence, "[new] evidence must establish sufficient doubt about [a petitioner's] guilt to justify the conclusion that his [incarceration] would be a miscarriage of justice *unless* his conviction was the product of a fair trial." *Schlup v. Delo*, 513 U.S. 298, 316 (1995) (emphasis in original). A gateway claim requires a petitioner to present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324.

Petitioner did not submit "new reliable evidence" of his innocence with his petition for a writ of habeas corpus. *Id.* Thus, Petitioner has failed to state a viable claim of actual innocence. Given this and the fact that there is no basis to toll the statute of limitations, the Court finds that Petitioner's federal petitioner for writ of habeas corpus must be dismissed because it was filed beyond the one-year statute of limitations.

### D. Certificate of Appealability

According to Rule 11(a) of the Rules Governing Section 2254 Cases, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." R. 11(a), Rules Governing Section 2254 Cases U.S. District Courts; *see also* 28 U.S.C. § 2253(c)(1)(A) (prohibiting an appeal to the respective court of appeals from a final order concerning a habeas corpus petition "[u]nless a circuit justice or judge issues a certificate of appealability"). A certificate of appealability ("COA") will not issue absent "a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)).

Where a district court dismisses a petition solely based on procedural grounds, and does not address the underlying constitutional claims, *Slack* instructs the court to issue a COA only when the petitioner demonstrates that "jurists of reason" would find both the petition's "claim of the denial of a constitutional right" and the district court's dispositive procedural ruling "debatable[.]" *Id.* at 484. As to whether the procedural ruling is "debatable[,]" *Slack* further advises that when the procedural bar present is "plain" and "the district court is correct to invoke it to dispose of the case," "jurists of reason" could not find "that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further. In such a circumstance, no appeal would be warranted." *Id.*

Here, Petitioner's petition will be dismissed because Petitioner failed to file his federal petition for a writ of habeas corpus within the one-year statute of limitations permitted under 28 U.S.C. § 2244(d)(1). Where such "a plain procedural bar is present[,]" this Court finds that "jurists of reason" would not and could not "find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. Thus, this Court will not issue a COA to Petitioner.

Petitioner may, however, seek a COA from the Fourth Circuit. Where a district court denies a COA, the petitioner "may not appeal the denial but may seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22." R. 11(a), Rules Governing Section 2254 Cases U.S. District Courts.

## IV. Conclusion

For the foregoing reasons, Respondent's Motion to Dismiss (Dkt. 17) will be granted. An appropriate Order and judgment shall issue.

/s/
Patricia Tolliver Giles
United States District Judge

Entered this 31st day of May, 2023.
Alexandria, Virginia